## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ADAM STILES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MOBILE FIDELITY SOUND LAB, INC.,<br><br>Defendant. | Case No.<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Adam Stiles ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Defendant Mobile Fidelity Sound Lab, Inc. ("MoFi" or "Defendant"). Plaintiff makes the following allegations based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant for the production and sale of vinyl records labeled as "Original Master Recording" or records sold as part of the "Ultradisc One Step" series (the "Records").

2.      As discussed throughout this Complaint, Defendant advertised the Records as being purely analog recordings—*i.e.*, directly from the master recording or original analog tapes—without any sort of digital mastering process.  Defendant also charged a price premium for the Records based on the same.  And indeed, these representations *used to* be true.

3.      However, since 2011, Defendant has been using digital mastering or digital files—specifically, Direct Stream Digital ("DSD") technology—in its production chain.  Worse still, Defendant continued to misrepresent to consumers that it did not use digital mastering, or

1

otherwise failed to disclose the use of digital mastering, while still charging the same price premium for the Records as if they were entirely analog recordings.

4.      Analog records are coveted not only for their superior sound quality, but also for their collectability.  Original recording tapes age, so only a limited number of analog recordings can be produced.  Further, because analog tapes are those used to record songs in the studio, a record cut from original analog tapes is as close to the studio recording as one can get.  Digital recordings, by contrast, do not carry as much value because they can be reproduced infinitely; once a digital recording is made, it can be copied as many times as a person desires.

5.      Thus, when Defendant began using a digital mastering process in its Records as opposed to purely analog, it inherently produced less valuable records—because the records were no longer of limited quantity and were not as close to the studio recording—yet still charged the higher price it proscribed to the allegedly all-analog recording process.

6.      Had Defendant not misrepresented that the Records were purely analog recordings, or otherwise disclosed that the Records included digital mastering in their production chain, Plaintiff and putative Class Members would not have purchased the Records or would have paid less for the Records than they did.

7.      Plaintiff and Class Members were accordingly injured by the price premium they paid for inferior Records.

8.      Plaintiff brings this action individually and on behalf of a class of all other similarly situated purchasers to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty, (iii) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*, (iv) fraud, (v) unjust enrichment, (vi) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCTPA"), N.C.G.S. §§ 75-1.1, *et seq.*, and (vii) violation of state consumer fraud acts.

## PARTIES

9.      Plaintiff Adam Stiles is a resident of Charlotte, North Carolina and has an intent to remain there, and is therefore a citizen of North Carolina.  Mr. Stiles has purchased various records from MoFi over the years.  Most recently, in or about February 2022, Mr. Stiles purchased The Pretenders' self-titled debut album for approximately $40, directly from MoFi via MoFi's website while Mr. Stiles was in North Carolina.  Prior to and at the time of purchase, Mr. Stiles reviewed the representations on MoFi's website regarding the Record, including that the Record was an "original master recording," as well as representations on the Record itself that the Record was made using the "Gain 2 Ultra Analog System," which "only utilize[s] first generation original master recordings as source material," and that "any sonic artifacts present are a product of the original master tape."  Nowhere on either the website or on the Record itself was there a representation that digital mastering or DSD was used as part of the recording or mastering process. Mr. Stiles relied on these representations and omissions in deciding to purchase the Record. Accordingly, these representations and omissions formed the basis of the bargain in that, had Mr. Stiles been aware that the Record used digital remastering or DSD technology, he would not have purchased the Record, or would have paid significantly less for it.  In or about July 2022, Mr. Stiles discovered that his Record used DSD technology as part of the mastering chain.

10.      Defendant Mobile Fidelity Sound Lab, Inc. is an Illinois corporation with a principal place of business at 1811 West Bryn Mawr Avenue, Chicago, Illinois 60660.  Defendant produced and sold the Records to consumers throughout the United States, including in the state of North Carolina.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed

class are in excess of $5,000,000.00, exclusive of interest and costs, there are approximately 5,000 members of the putative class, and Plaintiff, as well as most members of the proposed Class, are citizens of states different from Defendant.

12.     This Court has general personal jurisdiction over Defendant because Defendant is incorporated and maintains its principal place of business in Illinois.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### I.    An Overview Of The Record Production Process And Analog Versus Digital Technologies

14.     The production of a vinyl record begins with a studio recording.  Specifically, a musician will record an album at a studio, and the songs on the album will be preserved and finalized on an analog tape.  This tape is known as the "original master recording."

15.     To make (or "cut") a vinyl record from an analog tape, a sound engineer uses a

console (called a "lathe") to cut grooves into a vinyl record that create the sounds on the tape.



16.     Vinyl records made in this manner are considered "cut from the analog" or "all-analog recordings" because they are made directly from the analog (or studio) tapes.  However, making a vinyl record this way is a time-intensive process.  Further, making a vinyl record in this manner means constantly playing the analog tape, which can cause the tape to deteriorate over time.

17.     To avoid the problem of deterioration, some vinyl records today are made from digital recordings.  In this scenario, the analog tape is copied to a digital recording.  That digital recording is then used to press the vinyl record, instead of the original analog tape.

18.     The advantage of digital recording is that once a recording its digitized, it can be copied endlessly, allowing producers to save on costs and prevent the analog tape from deteriorating.  That is, whereas an all-analog recording means playing the analog tape as many times as a producer would like to make a vinyl record, digital means playing the analog tape once to record it to digital, and then using the digital recording to press the vinyl record.  However,

some of the sound quality is lost when an analog tape is converted to digital, and digital records are not as collectible or valuable as all-analog records because digital records can be infinitely produced.

19.     One method of creating a digital recording is "direct stream digital" or "DSD." DSD captures audio from the analog tapes at a higher resolution than other digital formats, and the DSD recording can then be used to mass produce a vinyl record. DSD creates this higher resolution by sampling the analog tape audio at a higher rate per second than other digital formats. Whether DSD is superior to other digital formats, however, it is nonetheless a digital recording that diminishes the quality and collectability compared to all-analog recordings.

## II.     Defendant Misrepresents That Its Records Do Not Use Digital Technology, And Fails To Disclose The Use Of Digital Technology In Its Mastering Chain

20.     Defendant MoFi is a record label that specializes in the production of high-fidelity vinyl records. MoFi has produced records for various artists, many of which are limited release.

21.     MoFi also notes on its website that it "believes that mastering systems should be neutral and transparent. The essential idea is to unveil all the detailed musical information on the original master recording without adding deterioration, coloration or other sonic artifacts."[1]

22.     MoFi produces and sells various types of vinyl records. Of note here are those Records that MoFi represents are "Original Master Recording" and/or part of the "Ultradisc One Step" series. Reasonable consumers purchasing the Records, including Plaintiff, understood MoFi's various representations and omissions regarding these records to mean that the Records were entirely analog recordings, with no digital mastering or DSD technology.

23.     MoFi specifically designated the Records as "Original Master Recording[s]," including all Records produced as part of MoFi's "Ultradisc One Step" series. "In the music

---

[1] https://mofi.com/pages/about-us.

business, a master recording is the official original recording of a song, sound[,] or performance … Master recordings can be distinguished as tapes, discs, pro tools session files *and digital formats such as MP3s*."[2] Thus, any consumer seeing the designation "Original Master Recording" would understand such a Record to be the "original recording of a song"—*i.e.*, an all-analog recording—*without* any digital remastering.

24. MoFi made it very clear which of its records were all analog and which were not via a banner on the front of each record. Specifically, the Records were labeled as "Original Master Recording"—such as the album Plaintiff purchased—connotating they were all-analog recordings, while those that were not all-analog were labeled as "Mobile Fidelity Sound Lab":

 

25. Of course, MoFi charged more for those records designated as "Original Master Recording" than those that were not.

26. MoFi also represented to consumers on the Records themselves that the Records did not use digital remastering, or otherwise failed to disclose the same. For instance, prior to July

---

[2] https://mixbutton.com/mastering-articles/what-is-the-master-recording/ (emphasis added).

2022, each Record that was produced as part of the "Ultradisc One-Step" process included the following chart in the Record's sleeve describing the process:



27.     The chart shows the original master recording being transferred directly to the vinyl recording, without any intermediary step involving a digital remaster.  The chart was also prominently displayed on the "Ultradisc One-Step" category of MoFi's website prior to July 2022[3]:



28.     The Record purchased by Plaintiff contains similar representations.  For instance, the Record specifically notes in the Record's sleeve that "any sonic artifacts present *are a product of the original master tape*":

---

[3] http://web.archive.org/web/20211021112037/https://mofi.com/collections/ultradisc-one-step.

Mobile Fidelity Sound Lab gratefully acknowledges and thanks these individuals and companies for their technical support and expertise: Tim de Paravicini, Edmund Meitner, Pass Labs, Lipinski Sound, EgglestonWorks, Sound Application, Linn & Z-Systems. Any sonic artifacts present are a product of the original master tape. Attempts to eliminate them would have negatively impacted the integrity of the presentation. Design for MFSL: John A. Beck

29.     Plaintiff's Record also notes it was made using MoFi's "Gain 2 Ultra Analog System for Vinyl."  Aside from having "analog" in the name of the process, at the time Plaintiff purchased his Record, MoFi described the Gain 2 process as "only utiliz[ing] *first generation original master recordings* as source material for our releases."[4]

30.     Further, each Record is given its own page and description on MoFi's website.  On none of these pages did MoFi indicate that any of its Records made use of digital mastering technologies such as DSD.

31.     MoFi cemented these representations in various interviews it gave over the years. For instance, in 2010, one of MoFi's mastering engineers maintained that "every MoFi LP—which was originally recorded to analog—is cut from an analog master tape."  This is in contrast to other companies, whose vinyl records "are now cut from digital masters."  Thus, the interviewer noted MoFi records produced "pure analog … sound[]."[5]

32.     Similarly, in 2017, two of MoFi's mastering engineers gave an interview regarding

---

[4] http://web.archive.org/web/20211018014348/https://mofi.com/pages/technologies#GAIN2_Analog (emphasis added).

[5] Steve Guttenberg, MoFi Remasters, Perfects LP Sound, CNET, Apr. 29, 2010, https://www.cnet.com/tech/home-entertainment/mofi-remasters-perfects-lp-sound/.

MoFi's production process. When asked about the "Gain 2 Ultra Analog System"—the system used to produce the Record Plaintiff purchased—the mastering engineers noted that "some people ask us questions like is it an all analog master chain? *It is*."[6]



33. Further, in 2020, MoFi sent customer service e-mails to consumers informing consumers "there is no analog to digital conversion in our vinyl cutting process. Any product that bears the ORIGINAL MASTER RECORDING stripe on the jacket lets the customer know that

---

[6] https://youtu.be/z-td3Uk5TIQ?t=100.

the Original Master Tape was used to produce the release":

> from: MOFI Customer Service <cs@mofi.com>
> date: 9 Oct 2020, 07:16
> subject: mastering question
> mailed-by: mofi.com
> [IMG]
>
> Thank you for your email, there is no analog to digital conversion in our vinyl cutting process. Any product that bears the ORIGINAL MASTER RECORDING stripe on the jacket lets the customer know that the Original Master Tape was used to produce the release.
>
> Any product that bears the MOBILE FIDELITY SOUND LAB stripe on the jacket lets the customer know that, although it is possible that what we have is the original master, that tape could not be fully verified as such and, in the interest of honesty, is not granted the ORIGINAL MASTER RECORDING stripe. As information on the tapes boxes for non-master sources are sometimes wrong or not present, we will not be listing what generation the source is. It may only be a guess and thus could not be consistent from title to title. If a non-master source meets our standard we will use it. If it does not, we will reject it.
>
> In addition, all titles on our main label are sourced from the original master tapes while; although the majority of Silver Label titles are sourced from the original tapes, there are some exceptions where the best available source is used. We do not use digital sources except in cases where the title's original master was digital itself.
>
> Customer Service
>
> Mobile Fidelity Sound Lab
>
> cs@mofi.com
> Hours: M-F 9am-5pm

34.     Based on these representations—on MoFi's website, on the Records themselves, in interviews, and in communications with consumers—Plaintiff and other purchasers of the Records were led to believe that all of the Records were entirely analog and mastered without the use of digital techniques like DSD.  Simultaneously, MoFi did not disclose to consumers or otherwise state that the Records were mastered using digital techniques like DSD, and Plaintiff and other consumers believed the Records were all-analog based on these omissions.

### III.     Defendant's Use Of Digital Technology And DSD In Its Mastering Chain Are Uncovered

35.     Prior to 2011, Defendant's representations were largely true.  However, since 2011, Defendant has been making use of digital techniques such as DSD in its remastering chain.  By the end of 2011, 60% of vinyl releases incorporated DSD, and MoFi's last non-DSD recording was in 2020.

36.     MoFi never disclosed this fact, nor did it change its representations to reflect the fact that its Records were using DSD.  Instead, MoFi intentionally hid this fact from consumers until a July 2022 interview where MoFi's engineers revealed the truth:

Q:      A lot of people I feel are under the assumption that everything you guys have done and everything you've ever done has been from analog … Are you doing everything analog or do we have any digital in the process?

…

A:      I think what you're getting at in the question … is there any digital in the chain?  We do have [] 4x DSD.[7]

37.     In other words, these engineers revealed that MoFi has been using digital remastering—specifically, DSD—in its production chain, and that the Records were not in fact "all-analog" as previously represented.

38.     Although MoFi moved quickly to rectify its misleading advertising and disclose the use of digital remastering in the Records, MoFi's corrections demonstrated the breadth of MoFi's representations and omissions and the material information MoFi misrepresented or failed to disclose.  For instance, the product page for the Record Plaintiff purchased previously made no mention of the use of DSD technology.[8]



MOVES FAST WITH BITING HOOKS, SOULFUL MELODIES, AND GUITAR-CHARGED TOUGHNESS

The milieu the Pretenders create on their groundbreaking debut didn't exist when the album came out in early 1980. Such is the magnitude of originality, creativity, and nerve the band captured on a record that captivated each side of the Atlantic and both upended and advanced tradition. The no-nonsense set also announced the arrival of the inimitable Chrissie Hynde, one of the greatest singer-songwriters in rock history, gender be damned. Equally significant, the album remains just one of two studio efforts featuring the original members before tragedy ended the lives of guitarist James Honeyman-Scott and bassist Pete Farndon.

39.     Now, MoFi's use of DSD is front and center.[9]



MOVES FAST WITH BITING HOOKS, SOULFUL MELODIES, AND GUITAR-CHARGED TOUGHNESS

1/4" / 15 IPS analog master to DSD 256 to analog console to lathe

The milieu the Pretenders create on their groundbreaking debut didn't exist when the album came out in early 1980. Such is the magnitude of originality, creativity, and nerve the band captured on a record that captivated each side of the Atlantic and both upended and advanced tradition. The no-nonsense set also announced the arrival of the inimitable Chrissie Hynde, one of the greatest singer-songwriters in rock history, gender be damned. Equally significant, the album remains just one of two studio efforts featuring the original members before tragedy ended the lives of guitarist James Honeyman-Scott and bassist Pete Farndon.

---

[7] https://youtu.be/shg0780YgAE?t=44

[8] http://web.archive.org/web/20211018015037/https://mofi.com/products/mfsl1-372_pretenders_pretenders_180g_lp.

[9] https://mofi.com/products/mfsl1-372_pretenders_pretenders_180g_lp.

40.     Similarly, the chart MoFi included for its "Ultradisc One-Step" recordings made no mention of the use of DSD.  Now, that chart has been amended to reflect the use of DSD in the production chain:



41.     These "corrective" representations demonstrate that not only were MoFi's misrepresentations and omissions done knowingly, but that MoFi failed to disclose or otherwise misrepresented material information to consumers regarding MoFi's production process.

## IV.     Consumers Pay A Price Premium For All-Analog Recordings

42.     MoFi's misrepresentations and omissions were not just disingenuous, they also caused economic injury to Plaintiff and other consumers.

43.     Consumers are willing to pay a premium for all-analog recordings for numerous reasons.  *First*, an analog recording is as close to a studio recording as one can get, "like reading literature in the original language," whereas "converting analog recordings to digital inevitably changes the sound in ways the band never intended."[10]  For that reason, many consumers maintain that analog recordings sound better than digital recordings.

44.     Part of this is a result of the concept of "losslessness."  When a recording is compressed so that it can be converted to digital, it loses frequencies "at the very highest and

---

[10] Steve Guttenberg, *Digital and Analog Audio's Curious Coexistence*, CNET, Apr. 28, 2018, https://www.cnet.com/tech/home-entertainment/digital-and-analog-audios-curious-coexistence/

lowest of a record." By contrast, an analog recording maintains the full spectrum of frequencies. Digital recordings that maintain most of but not the entirety of the range of frequencies are referred to as "near-lossless," but are not the same as an entirely "lossless" recording[11]:



45. *Second*, analog recordings are more collectible because only a limited quantity can be produced. Digital recordings are exact copies of one another that can duplicated indefinitely, theoretically without any loss in quality or degradation. So, once a digital recording is made, it can be copied infinite times and each copy will sound the same. However, this means digital recordings are not as collectible because there are an infinite number, and a vinyl record using digital remastering will sound the same as a digital record streamed on Spotify or Apple Music. By contrast, the original tapes degrade over time, meaning only a limited number of analog recordings can be made using the original master tapes until the tapes no longer function. Each analog recording may also sound different the further it is from the original (*i.e.*, the first analog recording may sound different from the one-hundredth). However, that also means that analog

---

[11] Devon Dean, *Analog vs Digital Media: Which Is Better?*, THE KLIPSCH JOINT, May 17, 2021, https://www.klipsch.com/blog/analog-vs-digital-media-which-is-better.

recordings are more collectible and more valuable because only a limited number can be produced before the original master tape deteriorates.

46.     MoFi recognizes that analog recordings are more valuable than digital recordings, which is why it charges a premium for the same.  Indeed, the Records are the most expensive vinyl records that MoFi sells, ranging from $40 (for the Record Plaintiff purchased) all the way up to $125 for some of the "Ultradisc One-Step" recordings.  By contrast, MoFi sells its digital recordings for $30 or less.

47.     Accordingly, MoFi charged Plaintiff and other Class Members a premium based on MoFi's representations that the Records were all-analog, and MoFi's failure to disclose that the Records made use of digital technologies like DSD in the production chain.  Had MoFi disclosed that its Records used DSD, or otherwise not mispresented that its Records were all-analog, Plaintiff and other Class Members would not have purchased the Records, or would have paid less for them.  Plaintiff and Class Members were thus injured by the price premium attributable to MoFi's representations regarding the all-analog nature of its Records, and MoFi's omissions regarding the use of DSD or other digital technologies in the Record's production.

## CLASS ALLEGATIONS

48.     **Class Definition:** Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiff seeks to represent a class defined as all persons in the United States who purchased a Record prior to July 15, 2022 (the "Class").  Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, any member of the judge's immediate family, and any person who purchased a Record used.

49.     Plaintiff also seeks to represent a subclass consisting of Class Members who purchased the Records in North Carolina prior to July 15, 2022 (the "Subclass").

50.     Collectively, the Class and the Subclass Class shall be known as the "Classes."

51.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

52.     **Numerosity:** The number of persons within the Classes is substantial, believed to amount to thousands of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's records.

53.     **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

        (a)    whether Defendant's labeling, marketing, and promotion of the Records was false and misleading;

        (b)    whether Defendant's conduct was unfair and/or deceptive; and

        (c)    whether Plaintiff and Class and Subclass Members have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

54.     **Typicality.** The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and

misleading misrepresentations and omissions, purchased a Record in reliance on the same misrepresentations and omissions, and suffered a loss as a result of that purchase.

55. **Adequacy of Representation:** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, to include additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

56. **Superiority:** A class action is an appropriate method for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Breach of Express Warranty**

57.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

58.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

59.     Defendant, as the designer, manufacturer, marketer, distributor, producer, and/or seller, expressly warranted that the Records were "all-analog" recordings, as described throughout this Complaint.

60.     In fact, these representations and warranties were false because the Records used digital technology in the recording chain and so were not "all-analog."

61.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and members of the Classes have been injured and harmed because they would not have purchased the Records, or would have paid substantially less for them, if they had known that the Records were not "all-analog" recordings.

62.     On August 17, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendant a letter advising that Defendant breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

### COUNT II
**Breach Of Implied Warranty**

63.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

64.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

65.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Records, impliedly warranted that the Records were "all-analog" recordings and did not make use of digital mastering technologies.

66.     Defendant breached this warranty implied in the contract for the sale of the Records because the Records could not pass without objection in the trade under the contract description, the Records were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiff and members of the Classes, and the Records do not conform to the promise or affirmations of fact made on website and packaging of the Records that the Records were "all-analog" and did not make use of digital mastering technologies in the production chain.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiff and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

67.     Plaintiff and members of the Classes purchased the Records in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

68.     The Records were not altered by Plaintiff or members of the Classes.

69.     The Records were defective when they left the exclusive control of Defendant.

70.     Defendant knew that the Records would be purchased and used without additional testing by Plaintiff and members of the Classes.

71.     Plaintiff and members of the Classes did not receive the goods as warranted.

72.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and members of the Classes have been injured and harmed because: (a) they would not have purchased the Records on the same terms if they knew that the Records were not "all-analog" and made use of digital technologies in the production chain; and (b) the Records did not have the

characteristics, uses, or benefits as promised by Defendant.

73.     On August 17, 2022, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendant a letter advising that Defendant breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **<u>Exhibit 1</u>**.

**<u>COUNT III</u>**
**Violation Of The Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.***

74.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

75.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

76.     The Records are consumer products as defined in 15 U.S.C. § 2301(1).

77.     Plaintiff and members of the Classes are consumers as defined in 15 U.S.C. § 2301(3).

78.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

79.     In connection with the marketing and sale of the Records, Defendant expressly and impliedly warranted that the Records were "all-analog" recordings and did not make use of digital technologies in the mastering chain.   These representations and warranties were false and described above.

80.     By reason of Defendant's breach of warranties, Defendant violated the statutory rights due Plaintiff and members of the Classes pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiff and members of the Class and Subclass.

81.     Plaintiff and members of the Classes were injured as a direct and proximate result of Defendant's breaches because they would not have purchased the Records or would have paid significantly less for them if they knew the Records were not "all-analog" and made use of digital technologies in the production chain, and such representations were therefore false and misleading.

## COUNT IV
### Fraud

82.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

83.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

84.     As discussed above, Defendant provided Plaintiff and members of the Classes with false or misleading material information about the Records, namely that the Records were "all-analog" and did not make use of digital technologies in the production chain.

85.     Similarly, as discussed above, Defendant failed to disclose material information to Plaintiff and members of the Classes, namely that the Records employed digital technologies in the production chain and were thus not "all-analog."

86.     These misrepresentations and omissions were made with knowledge of their falsehood.  Defendant manufacturers, produces, markets, and sells the Records.  Further, Defendant has admitted in a statement by its president in August 2022 that it has been using digital technologies in the production chain of Records since as early as 2011.[12]  Defendant therefore knew that it employed digital technologies in the mastering chain of the Records.

87.     The misrepresentations and omissions made by Defendant, upon which Plaintiff

---

[12] https://mofi.com/blogs/news/mofi-president-jim-davis-addresses-the-digital-lp-mastering-controversy.

and members of the Classes reasonably and justifiably relied, was intended to induce, and actually induced Plaintiff and members of the Classes to purchase the Records.

88.     Defendant had a duty to disclose the use of digital recording technologies in the production chain to Plaintiff and members of the Classes because (i) Defendant was in a fiduciary relationship with Plaintiff and members of the Classes, (ii) Defendant had superior and exclusive knowledge of the use of digital technologies in its production chain, and (iii) Defendant made partial representations regarding the Records as described above, while failing to disclose that Defendant employed digital technologies in the production chain.

89.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Classes, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V
## Unjust Enrichment

90.     Plaintiff incorporates by reference the allegations contained in all proceeding paragraphs of this complaint.

91.     Plaintiff brings this claim individually and on behalf of members of the Classes against Defendant.

92.     Plaintiff and members of the Classes conferred benefits on Defendant by purchasing the Records.

93.     Defendant has knowledge of such benefits.

94.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and members of the Classes' purchases of the Records.  Retention of moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Records were "all-analog" when they were not, and failed to disclose that the Records employed digital technologies in their production chain.

95.     Because Defendant's retention of the non-gratuitous benefits conferred on it by

Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and the members of the Classes for their unjust enrichment, as ordered by the Court.

## COUNT VI
### Violation Of The North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, *et seq*.

96.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

97.     Plaintiff brings this claim individually and on behalf of the members of the Subclass against Defendant.

98.     At all times mentioned herein, Defendant engaged in acts and practices "affecting commerce" in North Carolina, as that term is defined by N.C.G.S. § 75-1.1(b), because Defendant's sale of the Records were business activities.

99.     Defendant has committed unfair and deceptive acts or practices affecting commerce in violation of the NCTPA, namely the sale of the Records to consumers in North Carolina while falsely representing that the Records were "all-analog," and failing to disclose that the Records used digital technologies in their production chain.

100.     Defendant's misrepresentations and omissions, as described above, had the tendency to deceive the average consumer, including Plaintiff and Subclass Members.

101.     Defendant's actions were unfair because they offended established public policy and were unscrupulous and substantially injurious to consumers.

102.     Defendant's unfair and deceptive practices were material as they influenced purchasing and payment decisions by Plaintiff and Subclass Members.

103.     Plaintiff and the Subclass have been damaged as a direct and proximate result of Defendant's deceptive and unfair practices.

104.     Plaintiff and the Subclass are entitled to recover compensatory damages, treble

damages, and reasonable attorneys' fees and costs.

**COUNT VII**
**Violation Of State Consumer Fraud Acts**

105.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

106.    Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendants.

107.    The Consumer Fraud Acts of the fifty states and the District of Columbia, listed below, prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce:

| State | Statute |
|---|---|
| **Arizona** | Ariz. Rev. Stat. §§ 44-1521, *et seq.* |
| **Arkansas** | Ark. Code §§ 4-88-101, *et seq.* |
| **California** | Cal. Bus. & Prof. Code § 17200, *et seq.*; Cal. Bus. & Prof. Code §§ 17500, *et seq.*; Cal. Civ. Code §§ 1750 *et seq.* |
| **Colorado** | Colo. Rev. Stat. §§ 6-1-101, *et seq.* |
| **Connecticut** | Conn. Gen Stat. §§ 42- 110, *et seq.* |
| **Delaware** | 6 Del. Code §§ 2513, *et seq.* |
| **Washington, D.C.** | D.C. Code §§ 28-3901, *et seq.* |
| **Georgia** | Ga. Code §§ 10-1-390, *et seq.* |
| **Hawaii** | Haw. Rev. Stat. §§ 480-2, *et seq.* |
| **Idaho** | Idaho Code. §§ 48-601, *et seq.* |
| **Illinois** | 815 ILCS 501/1, *et seq.* |

| State | Statute |
| --- | --- |
| **Kansas** | Kan. Stat. Ann. §§ 50-623, *et seq.* |
| **Louisiana** | LSA-R.S. §§ 51:1401, *et seq.* |
| **Maine** | Me. Rev. Stat. Ann. Tit. 5, §§ 207, *et seq.* |
| **Maryland** | Md. Code Ann. Com. Law, §§ 13-301, *et seq.* |
| **Massachusetts** | Mass. Gen Laws Ann. Ch. 93A, §§ 1, *et seq.* |
| **Michigan** | Mich. Comp. Laws Ann. §§ 445.901, *et seq.* |
| **Minnesota** | Minn. Stat. §§ 325F, *et seq.* |
| **Montana** | Mont. Code §§ 30-14-101, *et seq.* |
| **Missouri** | Mo. Rev. Stat. §§ 407, *et seq.* |
| **Nebraska** | Neb. Rev. St. §§ 59-1601, *et seq.* |
| **Nevada** | Nev. Rev. Stat. §§ 41.600, *et seq.* |
| **New Hampshire** | N.H. Rev. Stat. §§ 358-A:1, *et seq.* |
| **New Jersey** | N.J. Stat. §§ 56:8, *et seq.* |
| **New Mexico** | N.M. Stat. §§ 57-12-1, *et seq.* |
| **New York** | N.Y. Gen. Bus. Law §§ 349 and 350 |
| **North Carolina** | N.C. Gen Stat. §§ 75-1.1, *et seq.* |
| **North Dakota** | N.D. Cent. Code §§ 51-15, *et seq.* |
| **Ohio** | Ohio Rev. Code §§ 1345.01, *et seq.* |
| **Oklahoma** | Okla. Stat. Tit. 15 §§ 751, *et seq.* |
| **Oregon** | Or. Rev. Stat. §§ 646.605, *et seq.* |
| **Pennsylvania** | 73 P.S. §§ 201-1, *et seq.* |
| **Rhode Island** | R.I. Gen. Laws §§ 6-13.1- 5.2(B), *et seq.* |
| **South Carolina** | S.C. Code Ann. §§ 39-5-10, *et seq.* |

| State | Statute |
|---|---|
| **South Dakota** | S.D. Codified Laws §§ 37-24-1, *et seq.* |
| **Tennessee** | Tenn. Code Ann. §§ 47-18-101, *et seq.* |
| **Texas** | Tex. Code., Bus. & Con. §§ 17.41, *et seq.* |
| **Utah** | Utah Code. §§ 13-11-175, *et seq.* |
| **Vermont** | 9 V.S.A. §§ 2451, *et seq.* |
| **Virginia** | Va. Code Ann. §§ 59.1-199, *et seq.* |
| **Washington** | Wash. Rev. Code §§ 19.86.010, *et seq.* |
| **West Virginia** | W. Va. Code §§ 46A, *et seq.* |
| **Wisconsin** | Wis. Stat. §§ 100.18, *et seq.* |
| **Wyoming** | Wyo. Stat. §§ 40-12-101, *et seq.* |

108.    Defendant intended that Plaintiff and each of the other members of the Classes would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

109.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Classes have sustained damages in an amount to be proven at trial.

110.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that this Court enter an Order:

    (a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and

naming Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(e)    An award of statutory penalties to the extent available;

(f)    For pre-judgment interest on all amounts awarded;

(g)    For an order of restitution and all other forms of monetary relief; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury on all claims so triable.

Dated: August 18, 2022                Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

By: */s/ Carl V. Malmstrom*
            Carl V. Malmstrom
Carl V. Malmstrom
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Facsimile: (212) 686-0114
E-mail: malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
Max S. Roberts
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

E-mail: pfraietta@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*